Filed 3/29/21  P. v. Naranjo CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FERNANDO NARANJO,<br><br>    Defendant and Appellant. | 2d Crim. No. B299429<br>(Super. Ct. No. BA473763)<br>(Los Angeles County) |

Fernando Naranjo appeals from the judgment after a jury convicted him of first degree premeditated murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a)) and found true an allegation that he personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).  The trial court sentenced him to 25 years to life in state prison on the murder and a consecutive 25 years to life on the firearm enhancement.

Naranjo contends the judgment should be reversed because the trial court erred when it:  (1) denied his

---

[1] Unlabeled statutory references are to the Penal Code.

*Batson/Wheeler*[2] motion, (2) permitted a detective to identify him in surveillance videos, (3) excluded portions of his police interview from the jury, (4) gave an incomplete jury instruction on imperfect self-defense, and (5) instructed the jury on flight. He further contends reversal is required because: (6) the prosecutor committed misconduct, (7) defense counsel provided ineffective assistance, and (8) these errors, considered cumulatively, denied him a fair trial. Alternatively, Naranjo argues the matter should be remanded for resentencing: (9) because the court abused its discretion when it declined to strike the firearm enhancement, (10) to permit the court to impose a lesser firearm enhancement, and (11) because the court declined to order a probation report prior to sentencing. We affirm.

FACTUAL AND PROCEDURAL HISTORY

Naranjo and J.Co. were outside a 99 Cents Store in Los Angeles. Naranjo retrieved something from his car, walked up to A.M., and said, "What's up, Guerito?" J.Co. saw that Naranjo was holding a gun, and ran across the street. Naranjo shot A.M. once in the head and walked away, taking off the vest he had been wearing as he walked down the street.

J.Ce. was working across the street from the shooting. He witnessed a man pull a gun from his waistband, say "[y]ou are going to die," and fire one shot. The man then turned and walked slowly down the street. He threw his vest over a fence as he walked.

When police arrived, J.Ce. and J.Co. each told the officers that the shooter had stashed a vest that may have a gun inside. An officer later found the vest wedged in a nearby gate.

---

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

The next day, police arrested Naranjo at S.M.'s apartment. J.Co. later identified Naranjo as the shooter. J.Co. also told police that Naranjo may have left his gun at S.M.'s apartment. Detective Eloy Ochoa interviewed Naranjo, who told him where the gun was hidden. When police retrieved it, it had four unfired bullets and one fired cartridge inside.

Ballistics revealed that the bullet recovered from A.M.'s head had been fired from the gun found in S.M.'s apartment. A mixture of three DNA profiles was on the gun. Naranjo's DNA was the primary contributor to the mixture.

Surveillance cameras at several nearby businesses covered the scene of the shooting. Video footage from one of the cameras showed A.M. riding his bicycle toward the 99 Cents Store and Naranjo running down the opposite side of the street. Footage from another camera showed Naranjo shoot A.M. in the head and walk away. Footage from a third also captured the shooting.

Detective Ochoa showed a six-pack photo array to witnesses. Three men who were working nearby the 99 Cents Store on the day of the shooting, including J.Ce., viewed the photo array, but none was able to identify Naranjo. Two of the witnesses believed another man resembled the shooter.

When Detective Ochoa interviewed Naranjo, he said he had been threatened by "Guero" and "Jorge": "[T]hey've been threatening me. And like I said, if I didn't do it, they were going to fuck me over anyway." Detective Ochoa understood "do it" meant shooting A.M. Naranjo claimed that he had reported Guero and Jorge's threats to police on the morning of A.M.'s shooting, but the detective could not corroborate that claim.

3

DISCUSSION

Batson/Wheeler *motion*

Naranjo first contends the judgment should be reversed because the prosecutor's reasons for excluding seven Latinx jurors were pretextual.  We disagree.

*1.  Legal framework*

The state and federal constitutions forbid prosecutors from using peremptory challenges to remove jurors on account of race.[3]  (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)  To succeed on a *Batson/Wheeler* motion, a defendant must first "make a prima facie showing that the prosecut[or] exercised a challenge based on impermissible criteria."  (*People v. Manibusan* (2013) 58 Cal.4th 40, 75 (*Manibusan*).)  If the defendant does so, the prosecutor must "offer nondiscriminatory reasons for the challenge."  (*Ibid.*)  These reasons "'need not support a challenge for cause,'" and may include such "'"trivial"'" things as "facial expressions, gestures, [and] hunches."  (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*), italics omitted.)  The trial court must then determine whether the prosecutor's proffered reasons are "credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination."  (*Manibusan*, at p. 75.)  "'The ultimate burden of persuasion regarding discriminatory motivation rests with, and never shifts from, the defendant.'  [Citation.]"  (*Ibid.*, alterations omitted.)

"On appeal, we review the trial court's determination[s] deferentially, 'examining only whether

---

[3] Code of Civil Procedure section 231.7, which becomes effective in jury trials commencing January 1, 2022, does not apply.  (Code Civ. Proc., § 231.7, subd. (i).)

4

substantial evidence supports its conclusions. [Citation.]' [Citation.]" (*Manibusan, supra,* 58 Cal.4th at p. 76.) "'We presume that a prosecutor uses peremptory challenges in a constitutional manner[,] and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.]'" (*Ibid.*) We will defer to the court's rulings "'[s]o long as [it] makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.'" (*Ibid.*) If the court does so, and "the prosecutor's reasons for excusing [a] juror are neither contradicted by the record nor inherently implausible," we will reject a defendant's *Batson/Wheeler* challenge on appeal. (*People v. Reynoso* (2003) 31 Cal.4th 903, 929 (*Reynoso*).)

### 2. Prospective Juror 7134

Prospective Juror 7134 had no prior jury experience. Neither the prosecutor nor defense counsel asked her any direct questions, nor did she volunteer any answers to the general questions asked of her venire. The prosecutor said she excused this juror "mainly due to her demeanor." She "seemed very . . . quiet" and "was not really engaging . . . when I was . . . asking general questions of the group." The prosecutor was also concerned that, based on the potential juror's lack of response to questions about being a lone holdout, that "maybe she [was] one of those people who would kind of just follow the group."

Naranjo claims that the prosecutor's "'[d]emeanor-based explanation[]' [was] 'particularly susceptible to serving as [a] pretext[] for discrimination.'" (Citing *United States v. McMath* (7th Cir. 2009) 559 F.3d 657, 665-666.) But a prosecutor may excuse a juror based on their demeanor during voir dire. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 109 (*DeHoyos*).) And they may "legitimately choose to shy away from . . . unduly timid

5

jurors." (*People v. Duff* (2014) 58 Cal.4th 527, 546 (*Duff*).)  This is true even if that timidness is "not explicitly confirmed by the record." (*People v. Mai* (2013) 57 Cal.4th 986, 1052 (*Mai*).)  So long as the record does not *contradict* the prosecutor's observations of the potential juror's demeanor—as is the case here—we cannot say the trial court erred.  (*Ibid.*)

### 3.  *Prospective Juror 7584*

The prosecutor said she excused Prospective Juror 7584 due to "some language restrictions."  When the trial court asked whether the prosecutor inquired of the prospective juror's language ability, the prosecutor replied that her decision was "just based on [the juror's] responses."  She continued:  "I don't think it rose to the level of her being unable to [serve].  My concern was there could have been some type of restriction that could arise from that, and so to be safe, I chose to kick her."

Difficulty speaking or understanding the English language is a permissible, race-neutral reason for a peremptory challenge.  (See, e.g., *People v. Jurado* (2006) 38 Cal.4th 72, 107-108 (*Jurado*); *People v. Ayala* (2000) 24 Cal.4th 243, 266-267 (*Ayala*).)  Naranjo claims, however, that "there was no indication [that Prospective Juror 7584] had any language issues when she answered the [trial] court's questions."  But neither the court nor defense counsel contradicted the prosecutor's description of the prospective juror's language abilities during voir dire.  That suggests the description was accurate.
(*People v. Adanandus* (2007) 157 Cal.App.4th 496, 510 (*Adanandus*).)

### 4.  *Prospective Juror 3570*

Prospective Juror 3570 was a single "young woman" who worked as an assistant softball coach and had no prior jury

experience. The prosecutor exercised a peremptory challenge against her due to a perceived "lack of life experience." The prosecutor explained: "She, you know, didn't have a—necessarily a career yet, is single, no children, and she just struck me as a person maybe lacking enough life experience, I think, to—for me—to serve on this jury or that I would like on this jury."

Naranjo claims the prosecutor's reason for dismissing Prospective Juror 3570 was pretextual because "it is implausible that the prosecutor would have excused every single, childless[] juror[,] regardless of race." But the prosecutor emphasized that she excused this potential juror based on her lack of life experience. And "[a] potential juror's youth and apparent immaturity are race-neutral reasons that can support a peremptory challenge." (*People v. Lomax* (2010) 49 Cal.4th 530, 575; see also *DeHoyos*, *supra*, 57 Cal.4th at p. 108.)

Alternatively, Naranjo claims that the prosecutor's reason for challenging Prospective Juror 3570 was pretextual because she did not challenge seven other jurors that purportedly shared her characteristics. But we can undertake comparative juror analysis for the first time on appeal only if "the record is adequate to permit the urged comparisons." (*Lenix*, *supra*, 44 Cal.4th at p. 622.) The pages of the record Naranjo cites in support of this claim in his opening brief do not permit those comparisons, lacking, at various points, information about each juror's race, marital status, or children.[4]

---

[4] Naranjo attempts to support his comparative juror analysis claim with fuller argument and better citations to the record in his reply brief. We do not consider these belated arguments here. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218 (*Rangel*).)

### 5. *Prospective Juror 2339*

When the prosecutor asked whether anyone felt that they could not convict if they did not know why a defendant had committed a crime, Prospective Juror 2339 said, "It would be hard for me [¶] . . . [¶] because without the motivation, maybe I would feel that your accusation—the crime that you're accusing the person of is not the right crime." The trial court then asked if the prospective juror saw someone hit another person with a bat, "in order to convict [them], are you going to want to know why [they] took a bat to that person?" The juror said, "[I]t's unfair to the jurors. It's unfair to us because we don't [¶] . . . [¶] hear their position—I would like to know the motive."

The trial court clarified: "[Y]ou couldn't convict because you would want to know why?" The prospective juror responded that he "would make a decision, but you make me doubt too much. So I guess it's their job to move me to guilty or not guilty." The court then reiterated that it would instruct jurors that motive is not an element of murder. The juror said, "Most likely, if I don't have the motive, I would say not guilty."

The prosecutor explained her decision to excuse Prospective Juror 2339: "I had some concern over his responses to some of the court's questions having to do with motive, and my concern was that he would not be an appropriate juror on this case for that reason." The court responded, "Actually, I was surprised you didn't raise it for cause with regard to that person." The prosecutor replied that she did not believe "it rose to the level of cause, but [she] did make note of it for a peremptory."

Naranjo claims the prosecutor's reason for challenging Prospective Juror 2339 was pretextual because the juror's answers did not reflect "an unwillingness to follow the

law" on motive. But he repeatedly stated his desire to know the defendant's motives, which provides substantial evidence to support a finding he was reluctant to follow the law. (*People v. Smith* (2018) 4 Cal.5th 1134, 1148-1150, 1155-1158.) And a potential juror's reluctance to follow the law is a "valid, race-neutral reason[] for exercising a peremptory challenge." (*People v. Smith* (2019) 32 Cal.App.5th 860, 873.)

### 6. Prospective Juror 2722

The prosecutor said she excused Prospective Juror 2722 based on his "very expressive" appearance: "He had a lot of tattoos; not that that is good or bad, but it caused me to wonder if he does have any, umm, differing views about things sort of outside the, like, societal norms on some issues."

Naranjo claims we should reject the prosecutor's proffered justification for excusing this prospective juror because "the court did not make any specific findings regarding whether . . . it was appropriate for the prosecutor to challenge the juror because he had tattoos and his 'outward appearance was very expressive.'" But a prospective juror's "unconventional appearance" can provide a race-neutral basis for a peremptory challenge. (*People v. Ward* (2005) 36 Cal.4th 186, 202.) "It matters not that another prosecutor would have chosen to leave the prospective juror on the jury." (*Reynoso, supra*, 31 Cal.4th at p. 924.) "Nor does it matter that the prosecutor, by peremptorily excusing [people with unconventional appearances], may be passing over any number of conscientious and fully qualified potential jurors." (*Ibid.*) "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*Ibid.*)

9

The trial court here concluded that it was. And we must defer to that conclusion so long as the court undertook a sincere evaluation of the prosecutor's justifications for excusing jurors. (*Manibusan*, *supra*, 58 Cal.4th at p. 76.) Naranjo makes no claim that the court failed to undertake such an evaluation.

### 7. *Prospective Juror 5992*

Defense counsel asked Prospective Juror 5992's venire whether any of them would be inclined to change their decision to go along with the group if they were the lone holdout. Prospective Juror 5992 replied, "I would think that maybe I'm not understanding, and because [if] 99 percent of everyone else is sticking to one side, then I probably have it wrong." Counsel then asked whether the prospective juror would stick with it or "go along with the group" if, after further discussion, she still felt her decision was right. She answered, "I would probably still go with the group."

The trial court explained that jurors should make an independent decision based on the evidence and deliberations. If, after deliberations, a juror still believed that they were right, they should stick to their decision, but if they genuinely changed their mind, they should change their decision. The court then asked jurors whether they would be able to "stick by [their] decision[s]." Prospective Juror 5992 said she would. The prosecutor nevertheless excused this prospective juror because she was not "entirely convinced" that she would follow the court's instructions.

Prosecutors may excuse jurors who appear to be "followers." (*Duff*, *supra*, 58 Cal.4th at p. 546.) Naranjo claims this rationale could not have applied to Prospective Juror 5992 because the prosecutor did not excuse another juror who similarly

10

indicated a willingness to "'go with the other jurors.'" But on the pages cited in his brief, two prospective jurors offered answers similar to those offered by Prospective Juror 5992. His attorney excused one of them, while the prosecutor excused the other. Naranjo's attempt to show the prosecutor's reason was pretextual accordingly fails.

### 8. *Prospective Juror 0939*

Prospective Juror 0939 had to be prompted by the trial court to provide his initial information. He did not volunteer any additional information, and was not directly asked any other questions.

The prosecutor said she excused Prospective Juror 0939 because "[h]is responses to the initial questions . . . were difficult . . . to understand." When the court asked for clarification, the prosecutor said that the prospective juror's accent "made it difficult for [her] to understand." She also noted that he "ha[d] to ask for questions to be repeated before he answered them, which indicated . . . there could be maybe some type of a language restriction there."

A juror's difficulty speaking or understanding the English language is a race-neutral reason for exercising a peremptory challenge. (*Jurado*, *supra*, 38 Cal.4th at pp. 107-108; *Ayala*, *supra*, 24 Cal.4th at pp. 266-267.) Naranjo claims that the prosecutor could not have relied on this reasoning because neither the trial court nor defense counsel had any trouble understanding Prospective Juror 0939. But when reviewing the denial of a *Batson*/*Wheeler* motion, our role is to determine whether substantial evidence supports the trial court's findings. (*Manibusan*, *supra*, 58 Cal.4th at p. 76.) Here, the court had to prompt Prospective Juror 0939 for his initial answers. And when

11

the prosecutor described why she excluded him from the jury panel, neither the court nor defense counsel contradicted her, suggesting her description was accurate. (*Adanandus*, *supra*, 157 Cal.App.4th at p. 510.) We thus cannot say that the trial court erred when it accepted the prosecutor's reason for excluding this juror. (*Mai*, *supra*, 57 Cal.4th at p. 1052.) Naranjo's *Batson/Wheeler* challenge accordingly fails.

*Surveillance video identifications*

Naranjo next contends the trial court erred when it permitted Detective Ochoa to identify him in the surveillance videos played at trial. But Naranjo did not object to the identifications during the proceedings below. His contention is forfeited. (*People v. Huggins* (2006) 38 Cal.4th 175, 236; see Evid. Code, § 353, subd. (a).) And even if it weren't, Naranjo has not shown that the court abused its discretion when it permitted Detective Ochoa to identify him in the videos. (Cf. *People v. Leon* (2015) 61 Cal.4th 569, 600 (*Leon*) [admission of identification evidence reviewed for abuse of discretion].)

*1. Background*

At trial, the prosecutor played surveillance video footage that showed the shooting of A.M. When Detective Ochoa began to describe the location and perspective of the first video, Naranjo objected "to publication without foundation." He did not object when the detective subsequently identified J.Co. in the video, however. The prosecutor then showed a portion of video that depicted "a person on the opposite side of the street riding a bicycle" and asked the detective if he had "an opinion as to who that person [was]." Naranjo objected on foundation grounds. The trial court asked Detective Ochoa to explain how he recognized that person. The detective said that he "believe[d] th[e] person in

the upper left-hand corner [of the video] to be the victim riding his bicycle" because that person "appear[ed] to be wearing the same clothing that was found—or at least the tank top that was found . . . at the crime scene."

Detective Ochoa later described a person running down the opposite side of the street from where the victim had ridden his bicycle. When the prosecutor asked if the detective had an opinion as to the identity of that person, he said that he believed it was Naranjo based on his facial hair, hairstyle, and mannerisms. He also agreed with the prosecutor that the person's clothes appeared to be "consistent with the clothing descriptions that were provided by the witness[es] in this case." Naranjo did not object.

When Detective Ochoa identified A.M., J.Co., and Naranjo in a second video, Naranjo again did not object. But when the detective described what "appear[ed] to be the victim" standing in front of the 99 Cents Store, Naranjo objected on foundation grounds. The trial court admonished the jury: "The video will speak for itself, ladies and gentlemen. You can interpret it as you wish but based on what the [detective] stated that it appears to be based on his knowledge of the case."

Detective Ochoa identified A.M., J.Co., and Naranjo in a third video. He again explained that he based his identifications on his knowledge of the case and having viewed the different videos. He also considered witnesses' statements, which corroborated what he had seen in the videos. Naranjo did not object to these identifications.

### 2. *Analysis*

Citing the secondary evidence rule, Naranjo first claims that Detective Ochoa's testimony was inadmissible to

13

prove the contents of the surveillance video.  But that rule does not apply where, as here, the video itself was admitted into evidence and the purpose of the witness's testimony was to "highlight important details in [it]."  (*People v. Son* (2020) 56 Cal.App.5th 689, 696.)

Naranjo next claims that Detective Ochoa's identification was an improper opinion on the ultimate issue of guilt.  (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048 [witness may not opine on defendant's guilt].)  But a nonexpert witness "may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of [their] testimony."  (*Leon*, *supra*, 61 Cal.4th at p. 601; see Evid. Code, § 800.)  And identity is "'a proper subject of nonexpert opinion.' [Citations.]"  (*Leon*, at p. 601, alterations omitted.)  Indeed, court decisions "have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Ibid.*)

Detective Ochoa's testimony easily met the *Leon* standards for admission.  First, the detective explained that he was able to identify Naranjo in the surveillance videos based on his personal knowledge of Naranjo's appearance.  That he obtained that knowledge after the murder of A.M. rather than before is irrelevant.  (*Leon*, *supra*, 61 Cal.4th at p. 601.)  Second, Detective Ochoa's opinion did not "invade the province of the trier of fact" because it was proffered as "an aid in the determination of the ultimate question of the identity of the culprit."  (*People v. Perry* (1976) 60 Cal.App.3d 608, 615.)  That was especially true here since "jurors could make up their own minds about whether the person shown [in the videos] was [Naranjo]."  (*Leon*, at p. 601.)  Thus, because Detective Ochoa's testimony was based on

14

personal knowledge and was helpful to the jury, the trial court did not abuse its discretion when it permitted him to identify Naranjo in the surveillance videos. (*Ibid.*)

*Exclusion of portions of police interview*

Next, Naranjo contends it was error for the trial court to exclude the portions of his police interview in which he described how he obtained his firearm. We are not persuaded.

*1. Background*

During his interview with Detective Ochoa, Naranjo said that he had hidden a gun at S.M.'s house. He also said that he had the gun because "a guy told [him] to go get it because he was afraid of getting it himself." The detective asked Naranjo whether the gun had "anything to do with what happened" outside the 99 Cents Store. Naranjo replied, "Obviously, yes, because that's what people have been saying."

Prior to trial, the prosecutor moved to admit portions of the interview. The trial court reviewed the transcript and ruled that the discussion about where Naranjo's gun was hidden was admissible. Defense counsel requested that the court additionally admit the portion of the transcript that described "how [Naranjo] obtained the gun and why the gun was located there." She claimed that those facts were relevant and helped to put Naranjo's entire statement in context.

The trial court reviewed the transcript again and said, "It says that he got the gun from somebody, that a guy told him to get the gun. It doesn't say that the guy told him to place it there . . . [or] that's why it was located there." Defense counsel again argued that "the fact that someone else gave him the gun is relevant as far as putting the entire statement into context."

15

At trial, Detective Ochoa testified that Naranjo told him that someone had given him the gun. He agreed that it was "a possibility" that Naranjo could have been referring to hiding the gun for that person when he said, "[I]f I didn't do it, they were going to fuck me over anyway." Naranjo did not renew his request to admit the excluded portions of his interview after Detective Ochoa testified.

## 2. Analysis

When one portion of a conversation is admitted into evidence, "the whole on the same subject may be inquired into by an adverse party," and any other portion of the conversation that is "necessary to make it understood" may also be admitted. (Evid. Code, § 356.) The purpose of this rule is "to avoid creating a misleading impression." (*People v. Samuels* (2005) 36 Cal.4th 96, 130 (*Samuels*).) But "[i]t applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced." (*Ibid.*) "Statements pertaining to other matters may be excluded." (*Ibid.*) We review for abuse of discretion. (*People v. Farley* (2009) 46 Cal.4th 1053, 1103.)

There was no abuse of discretion here. Naranjo's statements about *how* he came to possess the gun and *why* he hid it at S.M.'s house were not "on the same subject" as *where* the gun was hidden. Nor were they "necessary to make [Naranjo's statement about the hiding place] understood." The trial court was thus under no obligation to admit them. (*Samuels*, *supra*, 36 Cal.4th at p. 130.)

*People v. Chism* (2014) 58 Cal.4th 1266 is instructive. In *Chism*, the defendant shot a man during an attempted robbery. (*Id.* at pp. 1280-1281.) At trial, statements he made

16

while planning the robbery were admitted into evidence. (*Id.* at p. 1324.) But the trial court did not admit statements about why he shot the victim. (*Id.* at pp. 1324-1325.) The Supreme Court determined the court properly excluded those statements since they "had no bearing" on the statements that were admitted and no part of the admitted statements was misleading. (*Id.* at p. 1325.) The same is true here.

*Jury instruction on imperfect self-defense*

Naranjo contends the trial court did not fully and completely instruct the jury on imperfect self-defense. We disagree.

*1. Background*

During the conference on jury instructions, Naranjo requested that the trial court instruct the jury on self-defense based on threats he said he had received from A.M. and J.Co. The court questioned whether there was substantial evidence of imminent peril, and suggested that an instruction on imperfect self-defense might be warranted instead. Counsel then requested an instruction on imperfect self-defense. The prosecutor objected that such an instruction was unwarranted. The court decided to "err on the side of caution" and instruct the jury on imperfect self-defense with CALJIC No. 5.17.

*2. Analysis*

Naranjo argues the trial court should have supplemented CALJIC No. 5.17 with CALJIC No. 5.50.1 and CALCRIM No. 571. But CALJIC No. 5.50.1 is a pinpoint instruction that need not be given sua sponte. (*People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489 (*Garvin*).) And CALJIC No. 5.17 is "legally correct," thus if Naranjo wanted it supplemented with CALCRIM No. 571 he was obligated to request that

17

instruction. (*Garvin,* at p. 489.) Because he did not, his argument is forfeited. (*Ibid.*)

It also fails on the merits. We independently review whether the trial court properly instructed the jury on imperfect self-defense and whether its instructions "accurately state[d] the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We view the challenged instruction "'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied [it] in an impermissible manner.' [Citation.]" (*Ibid.*) Our job is to determine "whether there is a reasonable likelihood that the . . . instruction[] caused the jury to misapply the law." (*Ibid.*)

There was no such reasonable likelihood here. A defendant acts in imperfect self-defense when they "actually believe[] [that they] must defend [themselves] from imminent danger of death or great bodily injury" but their "belief is unreasonable." (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on other grounds by *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) As to the first of these requirements, "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) As to the second, a court assesses reasonableness "'from the point of view of a reasonable person in the position of defendant,'" taking into account "all the "'facts and circumstances [to] determin[e] whether the defendant acted in a manner in which a reasonable [person] would act in protecting [their] own life or bodily safety.""" [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083, alterations and italics omitted.) A prior threat is one such circumstance to take into account. (*Garvin, supra,* 110 Cal.App.4th at p. 489.)

18

Naranjo claims the trial court should have instructed jurors pursuant to CALJIC No. 5.50.1 because that instruction would have told them that he, as the recipient of prior threats, would have been justified in acting more quickly and taking harsher measures to defend himself. But CALJIC No. 5.50.1 instructs that a person who has previously been threatened is "justified in acting more quickly and taking harsher measures for self protection *from an assault* by [that person]." (Italics added.) There was no evidence that A.M. assaulted Naranjo before Naranjo shot him. CALJIC No. 5.50.1 was accordingly inapplicable.

The same is true of CALCRIM No. 571. That instruction would have told jurors that they should "consider all the circumstances as they were known and appeared" to Naranjo before he murdered A.M. (CALCRIM No. 571.) But CALJIC No. 5.17 told jurors that they should evaluate Naranjo's actions against "a reasonable person in the same situation seeing and knowing the same facts." Because CALCRIM No. 571 was largely redundant, it was unnecessary.

*Jury instruction on flight*

Naranjo next contends the trial court erroneously gave CALJIC No. 2.52 because substantial evidence did not support an instruction on flight. We disagree.

*1. Background*

During the jury instruction conference, the prosecutor requested an instruction on flight. Defense counsel objected that the instruction was unnecessary because Naranjo walked away after shooting A.M. and did not try to flee when he was arrested the next day. The trial court overruled the objection because the evidence showed that Naranjo, "though he may not

19

have run, walked away from the scene and allegedly tried to get rid of his green vest." It subsequently instructed the jury pursuant to CALJIC No. 2.52.

### 2. *Analysis*

If prosecutors rely on evidence of a defendant's flight as tending to show guilt, the trial court must instruct the jury that the flight is a factor to consider in deciding guilt or innocence. (§ 1127c.) To have the instruction given, "the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328 (*Bonilla*).) "'In this context, flight "requires neither the physical act of running nor the reaching of a faraway haven" but . . . does require "a purpose to avoid being observed or arrested."'" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1074.) "''Mere return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the circumstances of departure from the crime scene may sometimes do so." [Citations.]' [Citation.]" (*Ibid.*)

Substantial evidence supported the trial court's decision to instruct the jury on flight. After Naranjo shot A.M., he "immediately" walked away. (*People v. Howard* (2008) 42 Cal.4th 1000, 1020.) He then discarded his vest, which "suggest[s] 'a purpose to avoid being observed or arrested.' [Citation.]" (*Bonilla, supra*, 41 Cal.4th at p. 328.) The instruction was warranted. (*Jurado, supra*, 38 Cal.4th at p. 126 [trial court properly instructed jury on flight where defendant "walked a half-mile to a 7-Eleven Store, along the way hiding in a tree the scissors jack that had been used to kill" his victim].)

20

*Prosecutorial misconduct*

Naranjo next challenges the prosecutor's closing argument and rebuttal, claiming that she committed misconduct throughout. But Naranjo did not object to many of the alleged incidents of misconduct, nor did he request that the trial court admonish the jury to "disregard the perceived impropriet[ies]." (*People v. Thornton* (2007) 41 Cal.4th 391, 454 (*Thornton*).) Those challenges are forfeited. (*Ibid.*)

They also lack merit. "'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct.'" (*People v. Friend* (2009) 47 Cal.4th 1, 29.) "'[S]uch actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.]'" (*Ibid.*) "'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.]" (*Ibid.*)

*1. Misstatements of law on first degree murder*

Naranjo first claims the prosecutor committed misconduct by misstating the law on first degree murder. We disagree.

During her closing argument, the prosecutor discussed the elements of murder. She then discussed first degree murder:

"So question number one, was this murder?

"It absolutely was, yes.

"Now moving on to question number two. I told you at the very beginning of this case that this was

21

deliberate and premeditated murder. That's question number two, was it?

[¶] . . . [¶]

*"First degree murder is simply killing someone with malice.* Right? So we already talked about that. That's the murder component.

"But if that's done willfully, deliberately, with premeditation, now that's what we call first degree murder. It's still murder, but those things elevate it to first degree murder." (Italics added.)

We agree with Naranjo that the statement italicized above does not accurately reflect the law. (Compare § 187, subd. (a) [defining murder] with § 189, subd. (a) [defining first degree premeditated murder].) But the misstatement does not rise to the level of misconduct. (*People v. Fuiava* (2012) 53 Cal.4th 622, 691 ["inadvertent misstatement" not misconduct].) As soon as she made the statement, the prosecutor corrected herself to say that she had just defined murder again. She then turned to deliberation and premeditation, which "elevate[d]" Naranjo's crime "to first degree murder." The context of the prosecutor's statements thus reveals no misconduct. (*People v. Clark* (1990) 50 Cal.3d 583, 630.)

*2. Time spent deliberating*

Naranjo next claims the prosecutor committed misconduct because she told jurors that, "[u]nder the law, the length of time [a person deliberates] doesn't matter." But in context, the prosecutor was merely telling jurors that a deliberate killing need not be thought about for any particular length of time:

22

"It's not relevant how long you deliberate, or you think or you consider, what you're about to do.

"The length of time can vary depending on the person, depending on the situation. Someone could deliberate for days about, you know, whether they're going to kill someone or they could do it in seconds. It can happen in seconds."

That is an accurate statement of the law. (See, e.g., *People v. Morales* (2020) 10 Cal.5th 76, 88.)

### 3. *Use of hypotheticals*

Next, Naranjo claims the prosecutor committed misconduct by referencing hypothetical scenarios during closing argument. But Naranjo does not support this claim with citation to legal authority. It is therefore forfeited. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364.) And even if it weren't, "it is not misconduct for a prosecutor to invoke examples to illustrate a general point about the operation of the law." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 291.)

### 4. *Mischaracterization of police interview*

Naranjo next claims the prosecutor committed misconduct by mischaracterizing his interview with Detective Ochoa. We disagree.

The prosecutor played the last 15 minutes of Naranjo's hour-long interview with Detective Ochoa at trial. During closing argument, defense counsel told jurors that they had "only received a couple minutes of [the interview]." And "you'd better believe that the [prosecutor] would have played the entire statement, not just a couple minutes, if it was helpful for her. Hold her to that standard. That's a reason to doubt."

The prosecutor countered this argument in rebuttal:

> "The reason that you heard that portion is that . . . those are the most important things that the defendant said to the police.

> "The detective, when he testified, Detective Ochoa, told you that for 40 minutes, the defendant evaded questions, wouldn't give him direct answers about things—"

Defense counsel objected that this misstated the evidence, and the trial court admonished the jury that it should ask for readback of testimony if they had a question about the evidence. The prosecutor then continued:

> "The reason you got this portion is because after 40 minutes, he finally starts being a little honest about things. When his lies aren't working anymore, he starts giving little pieces of the truth.

> "That is the most important thing that he said, and so that is, of course, the part you are going to hear. That is what is relevant to this case."

A prosecutor can commit misconduct if they relay facts not in evidence to the jury. (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.) Here, however, "the prosecutor's remarks were merely responsive to defense counsel's own arguments to the jury on the state of the evidence." (*People v. Stanley* (2006) 39 Cal.4th 913, 952.) They also "constituted fair comment on the evidence, following evidentiary rulings we . . . upheld" above. (*People v. Lawley* (2002) 27 Cal.4th 102, 156.) That differentiates

this case from *People v. Daggett* (1990) 225 Cal.App.3d 751 and *People v. Varona* (1983) 143 Cal.App.3d 566, on which Naranjo relies, as each of those cases "involved erroneous evidentiary rulings on which the prosecutor improperly capitalized during . . . closing argument." (*Lawley*, at p. 156).

### 5. *Improper vouching for J.Co.'s credibility*

Naranjo next claims the prosecutor committed misconduct because she "vouched for [J.Co.'s] credibility by repeatedly telling the jury he was honest, credible, [and] reliable, and [that] she believed him." But he does not point to any specific statements in the record to support his claim. It is forfeited. (*In re Marriage of Marshall* (2018) 23 Cal.App.5th 477, 487 [appellate court will not sift through record to find support for appellant's claim].)

And even if it weren't, we see no indication that the prosecutor gave any "'personal assurances of [J.Co.'s] veracity or suggest[ed] that information not presented to the jury support[ed] his] testimony.' [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1167, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) She instead referenced his demeanor on the witness stand and the content of his testimony and invited jurors to find him credible. That was entirely permissible. (*Ibid.*)

### 6. *Lowering the standard of proof*

Naranjo next claims that the prosecutor lowered the standard of proof when she told jurors that any finding of reasonable doubt must be based on the evidence and suggested that Naranjo had a duty to prove his imperfect self-defense claim. This mischaracterizes the prosecutor's arguments.

The prosecutor argued that the killing of A.M. was not justified by discussing the lack of an imminent threat to Naranjo. She then encouraged jurors to "look at evidence. You have to make connections, connect the dots, make inferences. And you can only do those things using the evidence in the case."

Defense counsel responded to the prosecutor's argument about relying on the evidence by agreeing that, "yes, you are only to consider the evidence before you," but then argued that "reasons to doubt can be based on evidence that you would have wanted that you didn't receive."

The prosecutor countered that point during rebuttal:

> "Defense counsel, in her closing just now, argued to you that you should do the one thing that I told you over and over again you can't do. She wants you to think about things that are outside of the evidence that you received in this case—that's the only way the defenses that they've presented work—and you can't do that. None of us can because we don't know.
>
> "She wants you to fill in holes or come up with answers to questions that are outside of the realm of the evidence that you heard in this case.
>
> "And the reason she needs you to do that, the reason she needs you to not follow the instructions, one of the jury instructions that states to only consider the evidence—"

After defense counsel's objection that the prosecutor misstated the law was overruled, the prosecutor repeated that jurors should "only look at what you've got in front of you."

"Reasonable doubt may arise from the lack of evidence at trial as well as from the evidence presented." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1238.) The prosecutor did not suggest otherwise. Rather, she merely reiterated what the trial court had instructed the jury: that it had to "determine what facts ha[d] been proved from the evidence received in the trial and not from any other source"; that a "'fact' [was] something proved by the evidence"; and that "evidence" included "the testimony of witnesses, writings, material objects, or anything presented to the senses and offered to prove the existence or non-existence of a fact." (See CALJIC Nos. 1.00, 1.03, & 2.00.) Naranjo does not challenge these instructions, and we presume the jury followed them. (*People v. Homick* (2012) 55 Cal.4th 816, 853 (*Homick*).)

Naranjo also does not show that the prosecutor improperly suggested that he had the burden to prove his imperfect self-defense claim. (Cf. *People v. Centeno* (2014) 60 Cal.4th 659, 673 (*Centeno*) [error to tell jurors that defendant has burden to prove their innocence].) Again, in context, the prosecutor was merely repeating what the trial court had instructed jurors about basing their decision on the evidence presented. Moreover, when a defendant presents evidence in support of a self-defense claim at trial, a prosecutor is "within [their] rights to present evidence and argument that [the] defendant's evidence did not" support that claim. (*Thornton, supra*, 41 Cal.4th at p. 455.) The prosecutor did not lower the standard of proof or commit misconduct.

### 7. *Telling jurors to use "common sense"*

Next, Naranjo claims the prosecutor committed misconduct by telling jurors to use their "'common sense'" when

27

deciding whether she had fulfilled her burden of proof. During closing argument, the prosecutor told jurors, "If you employ common sense and you use your head and you assess the evidence, that's where all of this leads to." And during rebuttal, she said, "We want you to use common sense and reason to assess the evidence in this case and to decide whether or not [Naranjo] is guilty of first degree murder." This was not misconduct. It is well established that a juror may use their common sense to evaluate the evidence. (*Centeno*, *supra*, 60 Cal.4th at p. 669.)

### 8. *Appeals to sympathy and passion*

Lastly, Naranjo claims the prosecutor committed misconduct by "ask[ing] jurors to sympathize with [A.M.] and place themselves in his position while watching the surveillance videos." But the page Naranjo cites in the record does not support this claim. We decline to consider it.[5] (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.)

### *Ineffective assistance of counsel*

Naranjo contends counsel provided ineffective assistance throughout trial. But several of his claims of ineffective assistance are based on the alleged errors that we rejected above: that counsel did not object to the prosecutor's alleged misconduct, did not object to Detective Ochoa's identifications, and did not request CALJIC No. 5.50.1. An ineffective assistance claim based on any of these grounds necessarily fails. (*Homick*, *supra*, 55 Cal.4th at p. 893, fn. 44.)

---

[5] Naranjo attempts to support this claim with additional arguments and citations to the record in his reply brief. We do not consider these belated arguments. (*Rangel*, *supra*, 62 Cal.4th at p. 1218.)

The remainder similarly lack merit. To succeed on an ineffective assistance of counsel claim, a defendant must show that counsel performed deficiently and that that deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) The first of these showings requires the defendant to "establish that 'counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.' [Citation.]" (*In re Fields* (1990) 51 Cal.3d 1063, 1069, alterations omitted.) The second requires the defendant to establish that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*Id.* at p. 1070.) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*Ibid.*)

*1. Detective Ochoa's testimony*

Naranjo's first claim of ineffective assistance is based on counsel's failure to object to Detective Ochoa's testimony when asked about what Naranjo meant when he said, "And like I said if I didn't do it, they were going to fuck me over anyway." To Naranjo, the detective's reply (that "[i]f he didn't—if he didn't shoot the victim") was an improper opinion as to his state of mind (see *People v. Sanchez* (2016) 63 Cal.4th 411, 456) and guilt (see *People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 77). But even if we were to assume that the detective's testimony were improper, "[w]hether to object to inadmissible evidence is a tactical decision" that "seldom establishes counsel's incompetence." (*People v. Hayes* (1990) 52 Cal.3d 577, 621 (*Hayes*).) Defense counsel could reasonably have determined not to object to the detective's statement so as to not draw additional attention to it.

29

(*People v. Barnett* (1998) 17 Cal.4th 1044, 1140-1141.)  We thus cannot say that counsel performed ineffectively.  (*Id.* at p. 1141.)

### 2.  *The ballistics expert's opinions*

At trial, a firearms expert testified that he had compared the tool marks from a bullet fired from the gun found in S.M.'s house with the marks on the bullet retrieved from A.M.'s head.  Based on that comparison, the expert opined that the two bullets had been fired from the same gun.  He also said that another expert had examined his work and agreed with his opinion.  Defense counsel did not object to the expert's testimony.  Nor did she ask the expert about studies purportedly showing the unreliability of firearm comparison evidence.  Naranjo claims that constituted ineffective assistance.

We disagree.  "'[J]urors essentially can see [ballistics comparisons] for themselves'" and determine whether they agree with experts' opinions.  (*People v. Cowan* (2010) 50 Cal.4th 401, 470.)  And both the decision whether to object to improper testimony (*Hayes*, *supra*, 52 Cal.3d at p. 621) and how to conduct cross-examination are matters "within counsel's discretion [that] rarely implicate ineffective assistance of counsel."  (*People v. McDermott* (2002) 28 Cal.4th 946, 993.)  Perhaps counsel did not want to draw added attention to the ballistics expert's testimony given the jury's ability to see the tool marks for themselves.  Or perhaps she concluded that ballistics was not a weak part of the prosecutor's case and wanted to focus attention on other matters instead.  Either way, such a tactical decision does not constitute ineffective assistance.

### 3.  *CALJIC No. 2.91*

Naranjo next claims counsel was ineffective because she did not request that the trial court instruct jurors pursuant

to CALJIC No. 2.91, which would have told them that the prosecutor had to prove, beyond a reasonable doubt, that he was the person who killed A.M.  But a court should give that instruction upon request only if "'identification is a crucial issue and there is no substantial corroborative evidence'" in the case. (*People v. Alcala* (1992) 4 Cal.4th 742, 803 (*Alcala*), italics omitted.)  Here, there was substantial corroborative evidence of Naranjo's identity as the shooter:  eyewitness testimony, the surveillance videos, and Naranjo's actions before and after the shooting.  The court thus could have rejected any request for the instruction had it been made.

In addition, the trial court instructed the jury on "witness credibility (CALJIC No. 2.20), discrepancies in testimony (CALJIC No. 2.21), the weighing of conflicting testimony (CALJIC No. 2.22), the sufficiency of testimony from one witness (CALJIC No. 2.27), and reasonable doubt (CALJIC No. 2.90)." (*Alcala*, *supra*, 4 Cal.4th at p. 804.)  These "instructions were sufficient to inform the jury that the prosecution had the burden of establishing identity, and that defendant should be acquitted in the event the jury harbored a reasonable doubt on the issue of identity." (*Id.* at p. 803.)  Counsel was thus not ineffective by not requesting CALJIC No. 2.91.  (*Alcala*, at pp. 804-805.)

### *4.  CALJIC No. 8.73*

Finally, Naranjo claims counsel was ineffective because she did not request CALJIC No. 8.73, which would have told jurors that provocation can reduce first degree murder to second degree murder.  But that instruction need only be given if supported by substantial evidence.  (*People v. Avila* (2009) 46 Cal.4th 680, 707.)  Naranjo points to no evidence that he "formed

31

the intent to kill as a direct response to [A.M.'s] provocation and . . . acted immediately." (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, disapproved on another ground by *People v. Barton* (1995) 12 Cal.4th 186, 200-201.) Counsel was thus not ineffective for failing to request CALJIC No. 8.73. (*Alcala*, *supra*, 4 Cal.4th at pp. 804-805.)

*Cumulative error*

Naranjo contends the judgment should be reversed because the errors at trial, considered cumulatively, denied him a fair trial. But we have rejected all of his individual claims of error. His cumulative error claim thus necessarily fails. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1094.)

*Motion to strike firearm enhancement*

Naranjo contends the trial court erred when it denied his motion to strike the firearm enhancement imposed pursuant to section 12022.53, subdivision (d). We disagree.

*1. Legal framework*

Pursuant to section 12022.53, subdivision (d), a defendant convicted of a qualifying felony who personally and intentionally discharges a firearm causing death is subject to a sentence enhancement of 25 years to life in state prison. Subdivision (h) of section 12022.53 permits a trial court to strike that enhancement in the interest of justice. (See also § 1385, subd. (a).) When deciding whether to do so, the court should "consider the factors listed in California Rules of Court, rule 4.410 . . . as well as circumstances in aggravation and mitigation under rules 4.421 and 4.423." (*People v. Pearson* (2019) 38 Cal.App.5th 112, 117 (*Pearson*).) "'Unless the record affirmatively reflects otherwise,'" we presume that the court

32

considered these factors and circumstances. (*Ibid.*, alterations omitted; see Cal. Rules of Court, rule 4.409.)

We review a trial court's denial of a motion to strike a firearm enhancement for abuse of discretion. (*Pearson*, *supra*, 38 Cal.App.5th at p. 116.) An abuse of discretion occurs only "in limited circumstances," such as "where the . . . court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation]." (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).) "But 'it is not enough to show that reasonable people might disagree about whether to strike'" the enhancement. (*Ibid.*, alterations omitted.) "Where the record is silent [citation], or 'where the record demonstrates that the . . . court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm [its] ruling, even if we might have ruled differently in the first instance' [citation]." (*Ibid.,* alterations omitted.)

### 2. Analysis

There was no abuse of discretion here. At sentencing, Naranjo moved the trial court to strike the firearm enhancement because he was 41 years old and had no prior convictions. The prosecutor opposed Naranjo's motion based on the "egregious facts" of the murder. The court agreed with the prosecutor, finding that Naranjo's conduct was "egregious" based on "the manner in which he used the weapon to coldly go up to somebody and, execution style, murder that individual." It denied Naranjo's motion.

That denial was well within the court's discretion. "The factors that the trial court must consider when determining whether to strike a firearm enhancement under section 12022.53,

subdivision (h)[,] are the same factors the trial court must consider when handing down a sentence in the first instance." (*Pearson*, *supra*, 38 Cal.App.5th at p. 117.) Among those factors are the "cruelty, viciousness, or callousness" of the crime and that the defendant used a weapon to commit it. (Cal. Rules of Court, rule 4.421(a)(1)-(2).) The court below explicitly considered these factors. "[D]enying [Naranjo's] request to strike the firearm enhancement here was squarely within the bounds of the . . . court's discretion." (*Pearson*, at p. 118.)

Naranjo counters that his sentence should be reconsidered in light of the purpose of Senate Bill No. 620 (2017-2018 Reg. Sess.) (S.B. 620), which granted trial courts the discretion to strike firearm enhancements. (Stats. 2017, ch. 682, § 2.) But S.B. 620 was enacted prior to Naranjo's sentencing, and the trial court here was well aware of the discretion the bill granted to it. It does not follow that simply because the court chose not to exercise that discretion that that choice ran counter to S.B. 620's purposes. Indeed, Naranjo identifies nothing in S.B. 620 that would require deviating from the Legislature's determination that a willful, deliberate, and premeditated murder committed with the use of a firearm warrants a sentence of 50 years to life. It is only in the "extraordinary" case that courts should deviate from legislatively prescribed sentencing rules. (*Carmony*, *supra*, 33 Cal.4th at p. 378.) This is not that case.

*Lesser firearm enhancement*

Alternatively, Naranjo contends the case should be remanded to permit the trial court the opportunity to impose a lesser firearm enhancement. (See *People v. Morrison* (2019) 34 Cal.App.5th 217, 221-223 (*Morrison*).) We again disagree.

34

The prosecutors in *Morrison* originally alleged that the defendant had personally used a firearm (§ 12022.53, subd. (b)), personally discharged a firearm (*id.*, subd. (c)), and personally discharged a firearm causing death (*id.*, subd. (d)). (*Morrison*, *supra*, 34 Cal.App.5th at p. 221.)  Prior to submitting the case to the jury, however, prosecutors struck the subdivision (b) and (c) allegations, leaving jurors to decide only the subdivision (d) allegation. (*Morrison*, at p. 221.)  They found the allegation true, and the trial court added the corresponding enhancement to the defendant's sentence. (*Ibid.*)  On appeal, our colleagues in the First District vacated the enhancement. (*Morrison*, at p. 225.)  They concluded that the recent addition of subdivision (h) to section 12022.53 granted the trial court the discretion to strike the enhancement imposed pursuant to subdivision (d) and substitute one of the lesser included, uncharged enhancements instead. (*Morrison*, at pp. 221-223.)

As in *Morrison*, the jury here concluded only that Naranjo personally discharged a firearm causing death, and made no findings regarding any lesser included allegations.  But *Morrison* was decided in April 2019.  Naranjo was sentenced more than two months later.  Had he believed the trial court had the discretion to impose a lesser included enhancement, it was his duty to object to the sentence the court imposed. (*People v. Yanez* (2020) 44 Cal.App.5th 452, 460 (*Yanez*), review granted April 22, 2020, S260819.)  Because he failed to do so, his contention is forfeited. (*Ibid.*)

It also fails on the merits.[6]  Every case confronting the issue of whether section 12022.53, subdivision (h), permits a trial court to substitute a subdivision (b) or (c) enhancement for a subdivision (d) enhancement has concluded that *Morrison* was wrongly decided—i.e., that subdivision (h) does not "authorize[] a trial court to substitute one enhancement for another."  (*People v. Tirado* (2019) 38 Cal.App.5th 637, 643, review granted Nov. 13, 2019, S257658; see also *People v. Delavega* (2021) 59 Cal.App.5th 1074, 1087; *People v. Valles* (2020) 49 Cal.App.5th 156, 164-167, review granted July 22, 2020, S262757; *People v. Garcia* (2020) 46 Cal.App.5th 786, 790-794, review granted June 10, 2020, S261772; *Yanez, supra*, 44 Cal.App.5th at pp. 458-460, review granted.)  We find the analysis in these cases persuasive, and would apply their holdings here had Naranjo not forfeited his contention.

*Lack of a probation report at sentencing*

Finally, Naranjo contends the trial court erred when it declined to order a probation report before sentencing him.  But Naranjo did not object to the lack of a probation report at sentencing.  His contention is forfeited.  (*People v. Llamas* (1998) 67 Cal.App.4th 35, 38-39.)

It also fails on the merits.[7]  A defendant who uses a firearm to commit murder is ineligible for probation.  (§ 1203.06,

---

[6] We accordingly reject Naranjo's contention that counsel provided ineffective assistance by not requesting a lesser firearm enhancement.  (*Homick, supra*, 55 Cal.4th at p. 893, fn. 44.)

[7] We thus reject Naranjo's contention that counsel provided ineffective assistance by not objecting to the lack of a probation report.  (*Homick, supra*, 55 Cal.4th at p. 893, fn. 44.)

subd. (a)(1)(A).)  The trial court nevertheless has the discretion to order the probation department to produce a report to aid the court at sentencing.  (§ 1203, subd. (g); see *People v. Webb* (1986) 186 Cal.App.3d 401, 408-409.)  Here, however, Naranjo has not shown that the court abused that discretion because, as the court noted during the proceedings below, there was no need to order a probation report since Naranjo's sentence was "dictated by statute."  The mandatory sentence for first degree murder is 25 years to life in state prison.  (§ 190, subd. (a).)  And when it is not stricken, the mandatory sentence enhancement for a defendant who personally and intentionally used a firearm causing death is a consecutive 25 years to life.  (§ 12022.53, subd. (d).)  Thus even if Naranjo could show that the trial court abused its discretion by not ordering a probation report, he cannot show prejudice.

*People v. Tatlis* (1991) 230 Cal.App.3d 1266, on which Naranjo relies, is not to the contrary.  In that case, the trial court denied the defendant's request for an updated probation report to inform the court's exercise of discretion during resentencing.  (*Id.* at p. 1269.)  The appellate court determined it was error to deny the defendant's request because that denial was based on the trial court's conclusion that it lacked discretion to order a probation report and because the defendant showed prejudice.  (*Id.* at p. 1274.)  Here, in contrast, Naranjo did not request a probation report, the trial court knew it could order one, and Naranjo failed to show prejudice.  *Tatlis* is accordingly inapposite.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

TANGEMAN, J.

We concur:

YEGAN, Acting P. J.

PERREN, J.

George C. Lomeli, Judge

Superior Court County of Los Angeles

_____

        Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

        Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.